**EASTERN PARALYZED VETERANS ASSOCIATION, INC., William Hannigan, and Louis Dupilka, Petitioners,**

v.

**SECRETARY OF VETERANS AFFAIRS, Respondent.**

No. 00–7036.

United States Court of Appeals, Federal Circuit.

July 19, 2001.

Richard M. Zuckerman, Rubin Baum Levin Constant & Friedman, of New York, NY, argued for petitioners. With him on the brief was Jacob Inwald. Of counsel on the brief were James J. Weisman, and Kleo J. King, Eastern Paralyzed Veterans Association, Ltd., of Jackson Heights, NY.

Opher Shweiki, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Deborah A. Bynum, Assistant Director.

Before RADER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.

Opinion for the court filed by Senior Circuit Judge FRIEDMAN, in which Circuit Judge RADER joins. Concurring opinion filed by Circuit Judge GAJARSA.

FRIEDMAN, Senior Circuit Judge.

A veterans association and individual veterans challenge regulations of the Department of Veterans Affairs (Department), 38 C.F.R. §§ 17.34–17.38, that implement the Veterans' Health Care Eligibility Reform Act of 1996(Act), Pub.L. 104–262, § 104, codified at 38 U.S.C. § 1704 *et seq.* They assert that the regulations deny veterans due process, are inconsistent with the Act, and are arbitrary, capricious and an abuse of discretion. We reject these contentions and deny the petition for review.

I

The Act directs the Department to establish and operate an annual patient enrollment system for providing hospital and medical care to veterans. 38 U.S.C. § 1705. The Act provides for the annual enrollment of individual veterans based upon the veteran's application and the assignment of the veteran to one of seven specified priority categories.

The first three categories cover veterans with various degrees of service-connected disabilities. 38 U.S.C. § 1705(a)(1)-(3). The fourth category is for "[v]eterans who are in receipt of increased pension based on need of regular aid and attendance or by reason of being permanently housebound and other veterans who are catastrophically disabled." 38 U.S.C. § 1705(a)(4). The fifth category is for veterans who are not within one of the first four categories and are "unable to defray the expenses of necessary care" as defined

by 38 U.S.C. § 1722(a). 38 U.S.C. § 1705(a)(5). The sixth category covers veterans not within the first five categories and who meet specified criteria, including discharge "for a disability that was incurred or aggravated in the line of duty," receipt of a Purple Heart, "service in the Mexican border period or World War I," or "who [were] exposed to a toxic substance, radiation, or other conditions, as provided [elsewhere in the statute.]" 38 U.S.C. § 1710(a)(2). The seventh category is for veterans not covered by the preceding categories and for whom the Department determines that medical care is needed. 38 U.S.C. § 1710(a)(3). The statute provides that medical care will be provided to the categories "in the order listed." 38 U.S.C. § 1705(a).

The Act requires the Department to "maintain[ ] its capacity to provide for the specialized treatment and rehabilitative needs of disabled veterans (including veterans with spinal cord dysfunction, blindness, amputations, and mental illness) within distinct programs or facilities of the Department that are dedicated to the specialized needs of those veterans in a manner that (A) affords those veterans reasonable access to care and services for those specialized needs, and (B) ensures that overall capacity of the Department to provide such services is not reduced below the capacity of the Department, nationwide, to provide those services, as of [the date of enactment.]" 38 U.S.C. § 1706(b)(1).

On July 10, 1998, the Department published a notice of proposed rulemaking to implement the Act and invited public comments on the proposed rules. 63 Fed.Reg. 37299 (July 10, 1998).

On October 6, 1999, the Department published the final rules, which were codified at 38 C.F.R. §§ 17.34–17.38. 64 Fed. Reg. 54207 (Oct. 6, 1999). The regulations cover the enrollment and disenrollment process; the medical benefits package which describes the hospital care and medical services that will be provided to enrolled veterans; and the procedure for announcing which priority categories will be enrolled for the ensuing annual period, based on the Department's financial projections. 64 Fed.Reg. at 54212–54218. The final rule includes extensive discussion of the comments received and explains the changes made and not made in response to those comments.

At that time, the Department announced that it would enroll all seven priority categories of veterans for the period October 1, 1999 through September 30, 2000, unless it had to change this determination by subsequent rulemaking announcement. 64 Fed.Reg. at 54213.

Subsequently, the Department published an amended directive, *VHA Directive 2001–025: Catastrophically Disabled Veteran Evaluation* (Apr. 24, 2001) (Directive 2001–025), that provides "guidance on the process by which a veteran can request ... a review and be evaluated for catastrophically disabled (CD) status." Directive 2001–025 includes "sample letters for notifying veterans of an outcome of a [catastrophically disabled] evaluation or the fact that a [catastrophically disabled] evaluation could not be completed based on the information in the veteran's medical records" and "how to schedule an appointment for a catastrophically disabled examination." Directive 2001–025 also summarizes the right of a veteran who disagrees with the Department's evaluation either to seek reconsideration of a denied claim for benefits under 38 C.F.R. § 17.133 or appeal directly to the Board of Veterans' Appeals pursuant to 38 C.F.R. § 1705. The directive states that it "EXPIRES APRIL 30, 2006."

## II

The petition for review challenging the regulations is filed by Eastern Paralyzed

Veterans Associations, Inc., and two of its members. We have jurisdiction over the petition under 38 U.S.C. §§ 502, 7292(c). *Disabled Am. Veterans v. Gober,* 234 F.3d 682, 686 (Fed.Cir.2000).

The petition states that the association's two thousand members have sustained spinal cord injuries or have spinal cord dysfunction, and that the two members are "catastrophically disabled," have paraplegia and use a wheelchair. Except in the discussion of standing in this part, we refer to the petitioners collectively as "the Association."

The petitioners have presented a plethora of challenges to numerous provisions of the regulations. Many of them are insubstantial and do not require individual analysis. We consider below only those contentions that are sufficiently substantial to warrant discussion.

Before doing so, however, we address the Association's standing to maintain this proceeding. The government does not challenge such standing. But since standing involves "constitutional limitations on federal-court jurisdiction, [specifically] whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III," *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), we deem it appropriate to address the issue.

An association has standing "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Association seeks to protect the interests of paralyzed veterans in receiving medical care. This is germane

to the purposes of the Association which, as a chapter of the Paralyzed Veterans of America, seeks "to assure its members proper and dignified health care." (Plaintiff's Petition ¶ 11a.) The Association has alleged that two of its members (who are also petitioners in this action), have been incorrectly placed by the Department in category seven instead of category four. Accordingly, the Association has demonstrated that some of its members "would otherwise have standing to sue in their own right." Finally, as shown below, the Association's challenges to the Department's regulations do not require the participation of individual members.

Thus, the Association has standing to mount its challenges to the regulations.

### III

The Association contends that the regulations deny veterans procedural due process because they (A) do not "provide veterans with a meaningful opportunity to participate in the determination of their Priority Group", and do not tell them (B) the priority categories in which they have been placed upon enrollment, and (C) their right to challenge an adverse decision.

A. A veteran seeking to enroll for medical benefits is required to file an application on VA Form 10–10EZ, captioned "Application for Health Benefits." This is a two-page, relatively simple form calling for a variety of information, including fourteen questions that the veteran is to answer by circling "yes" or "no." One of these questions is: "Do you have a spinal cord injury." Although the form does not contain a space for the veteran to set forth additional information about his medical situation, the veteran presumably may attach to the form any additional relevant material.

The Secretary's amended directive provides "guidance on the process by which a veteran can request ... a review and be evaluated for catastrophically disabled (CD) status" and permits a veteran to "request[ ] a [catastrophically disabled] examination," which will be "scheduled and provided." Directive 2001–025.

The Act requires the Secretary to conduct an annual enrollment of veterans for medical care and to place each veteran in a particular priority category. The Department's procedure for doing so, which requires him to enroll and assign categories to a large number of veterans expeditiously, provides the veterans with procedural due process. *Cf. Mathews v. Eldridge,* 424 U.S. 319, 332–43, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that administrative procedures prescribed by the Secretary comport with procedural due process even though Social Security disability benefits are terminated before an evidentiary hearing is held); *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (holding that due process requires an evidentiary hearing before terminating welfare assistance because "termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits").

The Secretary's procedure gives a veteran a full and fair opportunity to make his case. He files a simple application form, may request an examination for catastrophic disability, is informed of his enrollment and his category and of his right to appeal an adverse decision to the Board of Veterans Appeal. The Secretary was not required further to give veterans an additional opportunity to participate in the decisional process before the veteran's enrollment and priority classification were initially determined. *Cf. Mathews v. Eldridge,* 424 U.S. at 345, 96 S.Ct. 893 (written submissions adequate in Social Security disability benefits determination where "[t]he detailed questionnaire which the state agency periodically sends the recipient identifies with particularity the information relevant to the entitlement decision, and the recipient is invited to obtain assistance from the local SSA office in completing the questionnaire. More importantly, the information critical to the entitlement decision usually is derived from medical sources, like the treating physician.").

B. The "[n]otification of enrollment status" provision of the regulation states:

Notice of a decision by a VA network or facility director, or the Chief Network Officer, regarding enrollment status will be provided to the affected veteran by letter and will contain the reasons for the decision. The letter will include an effective date for any changes and a statement regarding appeal rights.

38 C.F.R. § 17.36(d)(5). The "[n]otice of a decision ... regarding enrollment status" includes not only notice whether the veteran has been enrolled but also notice of the priority category in which he has been placed. This is confirmed by the Department's comments when the rule was promulgated.

Commenters asserted that the letter that VA sends veterans concerning their enrollment status should indicate which priority group the veteran was placed in.... We intend to provide this information to enrolled veterans as soon as possible.

64 Fed.Reg. at 54210.

The Department's operating guidelines also indicate that veterans will be informed of their priority classification. Directive 2000–001 includes sample letters for giving "written notification" to a veteran who "REQUESTED CATASTROPHICALLY DISABLED (CD) EVALUATION." Directive 2001–025, Attachments D and E.

Both sample letters state whether or not the veteran "meet[s] the definition of a catastrophically disabled veteran for ... health care purposes." The sample letter for a veteran who is determined to be catastrophically disabled also states: "Based on this determination, your enrollment priority group should change to Priority Group 4. Official notification of any changes in your priority group will be sent in a separate letter." Directive 2001–025, Attachment D. The sample letter for a veteran who is ruled to be not catastrophically disabled is to contain "both the reasons for the decision and a summary of the evidence considered by the VA"; advises the veteran how to "seek reconsideration of th[e] decision"; advises the veteran how to appeal the decision to the Board of Veterans' Appeals; and encloses the Department's Form 4107, Notice of Procedural and Appellate Rights. Directive 2001–025, Attachment E.

C. The governing statutes and regulations entitle a veteran to seek reconsideration of an adverse decision on entitlement or priority assignment and to appeal such decision to the Board of Veterans Appeals.

The Secretary states in his brief that "[p]ursuant to 38 C.F.R. § 17.133, a veteran may request reconsideration of an initial VHA classification determination, including a determination that the veteran did not meet the criteria to be classified as 'catastrophically disabled' [and that a] veteran also has the option of immediately appealing the initial VHA determination to the Board of Veterans' Appeals." Section 17.133 "sets forth reconsideration procedures regarding claims for benefits administered by the Veterans Health Administration." As noted, under the regulations the "[n]otice of a[n enrollment] decision ... will include ... a statement regarding appeal rights." 38 C.F.R. § 17.36(d)(5). The Department's comments when the rule was promulgated state that "veterans

may appeal VA decisions regarding enrollment and disenrollment to the Board of Veterans' Appeals and the Court of Veterans Appeals." 64 Fed.Reg. at 54211. Veterans have a statutory right to appeal to the Board of Veterans' Appeals any decision that "affects the provision of benefits ... to veterans," 38 U.S.C. § 511(a), including a Veterans Health Administrative decision concerning enrollment. 38 U.S.C. § 7104; *see also* 38 C.F.R. § 20.101(b) ("The Board's appellate jurisdiction extends to questions of eligibility for hospitalization, outpatient treatment, and nursing home and domiciliary care ... and for other benefits administered by the Veterans Health Administration.").

As the Secretary has recognized in his brief, the right of appeal covers a challenge to the priority category to which the veteran has been assigned. There is no reason to believe that the Department will deny veterans the right to notice and to appeal that it has provided for in its regulations and pronouncements.

D. The Association contends, however, that neither the Secretary's statements made in promulgating the regulations nor his directive implementing them may be properly considered in determining the constitutional validity of the regulations. In the Association's view, if the various procedures that the Secretary has announced he will follow in administering the regulations are not themselves set forth in the regulations, the latter cannot pass constitutional muster.

We disagree. The pertinent inquiry is the practical one whether, considering all the circumstances, the Secretary's regulations will provide veterans with a full and fair opportunity to present their claims to the Secretary. The form in which the procedures to be followed are set forth— whether in the regulations or in the Secretary's explanation and directive—is not the

critical issue. The question is whether the totality of the situation provides the veterans with adequate notice of the judicial disposition of their claim and an adequate opportunity to challenge an adverse ruling. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("The essential requirements of due process ... are notice and an opportunity to respond."); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *see also Immigration and Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights,* 502 U.S. 183, 190, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (relying upon agency's comments on a regulation to support the agency's interpretation of that regulation). As we have shown, the regulations and the Secretary's explanation and implementation of them satisfy that standard.

## IV

■ The Association argues that in defining "catastrophic disability" in the regulations, the Department improperly narrowed the scope of priority category four, which the Act defines as

> Veterans who are in receipt of increased pensions based on a need of regular aid and attendance or by reason of being permanently housebound and other veterans who are catastrophically disabled.

38 U.S.C. § 1705(a)(4). The Act does not define "catastrophically disabled," and the regulations therefore filled this gap by defining that term:

> [C]atastrophically disabled means to have a permanent severely disabling injury, disorder, or disease that compromises the ability to carry out the activities of daily living to such a degree that the individual requires personal or mechanical assistance to leave home or bed or requires constant supervision to avoid

physical harm to self or others. This definition is met if an individual has been found by the Chief of Staff (or equivalent clinical official) at the VA facility where the individual was examined to have a permanent condition [enumerated in the regulation].

38 C.F.R. § 17.36(e).

The Association complains that the Department's definition improperly limited the statutory term "catastrophically disabled" by adding the requirements that the veterans' condition be "severely" disabling and that it be "permanent." In defining the phrase, the Department acted under its authority to promulgate "all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws." 38 U.S.C. § 501(a). The Department's definition of "catastrophically disabled" veterans to mean those with "a permanent severely disabling injury, disorder, or disease" is a permissible gloss upon the statutory language that was well within the Secretary's authority to adopt.

The Department's definition is consistent with the legislative history of the Act. Priority group four is described as:

> a category of priority for those otherwise eligible veterans ... who are catastrophically disabled, such as veterans with spinal cord injuries. Such veterans would be included in a third tier priority with other profoundly disabled nonservice-connected veterans who receive increased pension based on a need of regular aid and attendance or permanent housebound status.

H.R.Rep. No. 104–690 (1996). Congress identified spinal cord injuries as an example of a catastrophic disability, and spinal cord injuries are generally permanent. Furthermore, Congress described catastrophically disabled veterans as similarly

situated to "other profoundly disabled non-service-connected veterans who receive increased pension based on a need of regular aid and attendance or permanent housebound status."

After defining "catastrophically disabled," the regulation states that "[t]his definition is met if an individual has been found ... to have a permanent condition specified" in subparagraphs that follow the definition. 38 C.F.R. § 17.36(e). These include "[q]uadriplegia," "quadriparesis," "paraplegia," "blindness," "persistent vegetative state," or "a condition resulting from two of the following [surgical procedures]." *Id.*

The Association contends that this provision is ambiguous because it could be read as indicating that to be within priority category four, the veteran must be both "catastrophically disabled" and also suffer from one of the enumerated conditions. The provision is not ambiguous. Its meaning is clear and precise. After defining "catastrophically disabled," it states that "[t]his definition is met" if a veteran is found to have one of the enumerated conditions. In other words, a veteran who suffers from one of those conditions comes within the category of "catastrophically disabled." Nothing in the regulations either suggests, or could properly be interpreted to mean, that to be placed in category four, a veteran must be both categorically disabled and suffer from one of the enumerated conditions. The conditions are not an additional requirement for being catastrophically disabled but a basis for establishing that condition.

The Association argues that this provision was made ambiguous by the Department's answer to a comment on the proposed regulations that apparently assumed that veterans had to meet both requirements. 64 Fed.Reg. at 54208. The Department responded that "[b]oth the defi-

nition and the specific conditions or the functional disability levels that meet the definition are necessary to ensure that the term 'catastrophically disabled' is uniformly applied." *Id.* The Department also stated that other medical conditions need not be specifically enumerated in § 17.36(e) because "[c]onditions not specifically mentioned ... would be covered when the criteria in § 17.36(e) are met. It is impractical to attempt to list all of the specific conditions that would be covered by the criteria." 64 Fed.Reg. at 54209. These comments make it clear that to be "catastrophically disabled," a veteran would not have to both satisfy the definition and have an enumerated condition.

## V

■ The Act requires the Department to "maintain[ ] its capacity to provide for the specialized treatment and rehabilitative needs of disabled veterans (including veterans with spinal cord dysfunction, blindness, amputations, and mental illness) within distinct programs or facilities of the Department that are dedicated to the specialized needs of those veterans in a manner that (A) affords those veterans reasonable access to care and services for those specialized needs, and (B) ensures that overall capacity of the Department to provide such services is not reduced below the capacity of the Department, nationwide, to provide those services, as of [the date of enactment]." 38 U.S.C. § 1706(b)(1).

The regulations list the "hospital and outpatient care [that] constitutes the 'medical benefits package' basic care and preventive care" that the Department will provide:

(i) Outpatient medical, surgical, and mental healthcare ...

(ii) Inpatient hospital, medical, surgical, and mental healthcare ...

(iii) Prescription drugs, including over-the-counter drugs and medical and surgical supplies available under the VA national formulary system.

(iv) Emergency care . . .

(v) Bereavement counseling . . .

(vi) Comprehensive rehabilitative services . . .

(viii) Durable medical equipment and prosthetic and orthotic devices . . .

(ix) Home health services . . .

(x) Reconstructive (plastic) surgery required as a result of disease or trauma. . . .

38 C.F.R. § 17.38(a).

The Association contends that three aspects of this "medical benefits package" violate the foregoing statutory provisions requiring the Department to "maintain[ ] its capacity to provide for the specialized treatment and rehabilitative needs of disabled veterans."

First, the Association complains that the package fails to include specialized treatment for spinal cord dysfunction, blindness, amputations, and mental illness within distinct programs or facilities, as the Act requires. The Department has defined the benefits it would provide not in terms of the particular medical conditions that would be covered but in terms of the general categories of the medical services to be furnished. This gives the Department a desirable flexibility in treating various medical conditions that it might lack if it attempted to define in advance all the conditions for which it would provide treatment.

The Secretary's decision to adopt this approach in listing the benefits to be provided was within his discretion to administer the Act. 38 U.S.C. § 1706(a) ("In managing the provision of hospital care and medical services, . . . the Secretary shall, to the extent feasible, design, establish and manage health care programs in such a manner as to promote cost-effective delivery of health care services.").

The Act itself requires the Secretary "to provide for the specialized treatment and rehabilitative needs of disabled veterans (including veterans with spinal cord dysfunction, blindness, amputations, and mental illness);" there was no need for the Secretary to repeat this requirement in the benefits package. As the Department explained in response to a suggestion that the package include a statement that "the [Department] will maintain its capacity to treat disabled veterans in accordance with the provisions of 38 U.S.C. § 1706," such a statement was unnecessary since "[t]he statutory provisions are adequate by themselves to provide notice of this requirement." 64 Fed.Reg. at 54211.

■ Second, the Association complains because prescription drugs are limited to those "available under the VA national formulary system." The Secretary states, however (and the Association does not deny), that the VA national formulary system lists the drugs and supplies that will be available throughout the veterans healthcare system and permits the use of other drugs and supplies if medically required. This is a reasonable and appropriate method for "managing the provision of hospital care and medical services . . . in such a manner as to promote cost-effective delivery of health care services," as the Department is required to do. 38 U.S.C. § 1706(a).

■ Finally, the Association complains because the medical benefits package excludes *in vitro* fertility treatment. The original proposed benefits package did not include any infertility services. In response to comments, however, the Department added such services "(other than in vitro fertilization)." 64 Fed.Reg. at 54210. Such action was consistent with the agency's long-established practice, as it ex-

plained in a 1989 report to a Senate Committee that was considering a proposed bill authorizing such services:

> The Department has consistently stated that furnishing reproductive services such as in vitro fertilization ... would raise profoundly difficult philosophical, practical, and perhaps legal questions on which there is no societal consensus. It remains our view that VA should not become enmeshed in these matters. The issue raised by such legislation is not simply whether veterans might benefit from such a service.... Provisions like this raise more far-reaching and troublesome questions.

S.Rep. No. 101–126, at 349–350 (1989), *reprinted in* 1989 U.S.C.C.A.N. at 1745.

Nothing in the Act indicates that Congress intended to require the Department to provide veterans with infertility treatment. Except where the Act requires specific services or care for designated medical condition, the Secretary has broad discretion to determine the precise hospital or medical services to be supplied. The Secretary did not abuse his discretion in failing to include in vitro fertilization in the medical benefits package.

## VI

■ The Association's final argument is that because the regulations permit the Secretary to disenroll veterans during the year of enrollment due to a lack of funds to cover the provision of medical services for them, the regulations violate the statutory requirement that the Department "establish and operate a system of annual patient enrollment." 38 U.S.C. § 1705(a). In other words, the Association contends that because veterans are enrolled for a year, the Department must continue to furnish them medical services for that period, even though during that period the Department runs out of funds to do so. The Association thus treats enrollment for a year as a guarantee that the Department will provide care and services for that entire period.

The Act itself refutes this contention. It provides that "in any fiscal year" the requirement that the Department "shall" provide hospital care and medical services to specified veterans is "effective ... only to the extent and in the amount provided in advance in appropriation Acts for such purposes." 38 U.S.C. § 1710(a)(4) (Supp. IV). It further provides that the Secretary also "may" furnish such care and services to other veterans "to the extent resources and facilities are available." 38 U.S.C. § 1710(a)(3) (Supp.IV).

The legislative history confirms that Congress recognized that enrollment for a year does not guarantee the availability of medical care and hospital services for that period. The House Committee Report stated:

> As currently instituted at many VA facilities, an enrollment system does not involve a contractual relationship between the VA and the enrollee or otherwise guarantee the enrollee that the VA will necessarily deliver all needed care.

H.R.Rep. No. 104–690 (1996). The House Report also stated that the Act did not guarantee veterans health care:

> [the Act] specifically and substantially limits VA's obligation to provide care. The scope of VA's mandate reaches only "to the extent and in the amount provided in advance in appropriations Acts for these purposes" [and] creates no such expectation [that veterans are entitled to care].

*Id.* The Report points out that under the Act the Secretary will have "discretion" to register veterans for only "part of a fiscal year." *Id.*

In *Babbitt v. Oglala Sioux Tribal Public Safety Department*, 194 F.3d 1374 (Fed.

Cir.1999), this court rejected a similar argument. That case involved a contract between the Secretary of the Interior and an Indian tribe pursuant to the Indian Self–Determination and Education Assistance Act (ISDA), 25 U.S.C. §§ 450–450n, under which the Department of the Interior agreed to fund certain expenses the tribe would incur in itself conducting federal programs. Because Congressional appropriations were insufficient to fund all of the government's contractual obligations to the tribe for the year in question, the Department paid only ninety-two percent of the contractual amount. A Board of Contract Appeals awarded the tribe the deficiency in the government's funding of the contract; but this court reversed.

The court pointed out that the Act was "clear and unambiguous" in providing that "any funds provided under an ISDA contract are 'subject to the availability of appropriations,'" and that "[o]ther sections of the ISDA indicate congressional intent to make ISDA funding subject to the availability of appropriations." *Id.* at 1378. The court also pointed out that "in the face of congressional under-funding, an agency can only spend as much money as has been appropriated for a particular program." *Id.* It noted that the model contract set forth in the Act, which was incorporated by a reference into the tribe's contract with the Secretary "specifies that '[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement.'" *Id.*

The language and reasoning of *Oglala* are equally applicable to the present case and require rejection of the Association's contention that the annual enrollment provision of the statute would bar the Secretary from disenrolling particular categories of veterans during that period if appropriated funds were insufficient to cover the cost of providing hospital care and medical services to them. Here, as in that case, the statute "indicate[s] congressional intent to make [veterans' medical care] funding subject to the availability of appropriations." *Id.* As the Department correctly stated in promulgating the regulations, it "can only provide services insofar as there are available funds to cover the services" and has "no authority to make permanent an enrollee's right to receive medical services." 64 Fed.Reg. at 54210.

## CONCLUSION

Since we have rejected all the Association's challenges to the regulations (including those not discussed), the petition for review is

*DENIED.*

GAJARSA, Circuit Judge, concurring.

I agree with the judgment and conclusions of the majority. However, I write separately to clarify that our decision upholds the constitutionality of the regulations on their face, not in their application.

▮▮▮▮▮▮ Eastern Paralyzed mounts a facial challenge to the regulations. Eastern Paralyzed argues that the regulations themselves must contain provisions necessary to satisfy the due process requirements. However, Eastern Paralyzed faces a "heavy burden in seeking to have the regulations invalidated as facially unconstitutional." *Rust v. Sullivan,* 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). A facial challenge is the "most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists" under which the regulations could be valid. *Id.*

In this case, Eastern Paralyzed contends that the regulations might operate unconstitutionally if the Department of Veterans Affairs Directive ("DVA Directive") were

rescinded or modified. Indeed, a veteran's right to present evidence, rebut evidence, and request a medical examination flows from the DVA Directive, not the language of the regulation itself.

 An agency directive is not subject to the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553 (1994), and may be modified or rescinded at any time. Indeed, the DVA Directive at issue in this case was recently altered without notice and comment rulemaking procedures, and is set to expire in 2006.

 It is possible that veterans may be deprived of their due process guarantees if the DVA Directive is altered or rescinded, leaving veterans without any opportunity to present evidence, rebut evidence, or request a medical examination. However, this possibility cannot serve as the basis for declaring the regulations unconstitutional in a *facial* challenge. The fact that the regulations "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

As currently applied, the regulations comport with the due process requirements because the DVA Directive furnishes veterans with the right to present evidence, rebut evidence, and request a medical examination. Therefore, the regulations cannot be unconstitutional on their face.