(Slip Opinion)

# Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services

The rule issued by the Department of Veterans Affairs on Reproductive Health Services is a lawful exercise of VA's authority. States may not impose criminal or civil liability on VA employees—including doctors, nurses, and administrative staff—who provide or facilitate abortions or related services in a manner authorized by federal law, including VA's rule. The Supremacy Clause bars state officials from penalizing VA employees for performing their federal functions, whether through criminal prosecution, license revocation proceedings, or civil litigation.

September 21, 2022

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF VETERANS AFFAIRS

The Department of Veterans Affairs ("VA") has issued an interim final rule permitting VA to provide veterans and certain other VA beneficiaries with access to abortion services when the life or health of the pregnant individual would be endangered if the pregnancy were carried to term or when the pregnancy is the result of rape or incest. Reproductive Health Services, 87 Fed. Reg. 55,287, 55,287–88 (Sept. 9, 2022) (the "rule"). VA's rule also permits VA to provide abortion counseling. *See id.* Prior to VA's issuance of the rule, this Office advised VA that the rule represented a reasonable exercise of the VA Secretary's discretion to provide medical services. We also advised that states may not impose criminal or civil liability on VA employees—including doctors, nurses, and administrative staff—who provide or facilitate abortions or related services in a manner authorized by federal law, including VA's rule. The Supremacy Clause of the U.S. Constitution bars state officials from penalizing VA employees for performing their federal functions, whether through criminal prosecution, license revocation proceedings, or civil litigation. *See id.* at 55,293–94. This memorandum memorializes and expands upon our prior advice.

## I.

"The Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it," unless federal law authorizes such state regulation. *United*

1

*States v. Washington*, 142 S. Ct. 1976, 1982 (2022); *see* U.S. Const. art. VI, cl. 2. In *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), "Chief Justice John Marshall explained that, under the Supremacy Clause, 'the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.'" *Washington*, 142 S. Ct. at 1983–84 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 436). "The Court thus interpreted the Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government." *Id.* at 1984.

This principle is often referred to as intergovernmental immunity. The doctrine is "subject to nuances," *Disaster Assistance and the Supremacy Clause*, 5 Op. O.L.C. 198, 199 (1981) ("*Disaster Assistance*"), and "[o]ver time" it has "evolved," *Washington*, 142 S. Ct. at 1984. As relevant here, the doctrine "prohibit[s] state laws that . . . 'regulate the United States directly,'" absent any federal law consenting to the application of state law. *Id.* (alterations omitted) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).

In determining whether a state law is invalid as a direct regulation of the United States, courts look to whether the provision "seeks to regulate the federal function itself." *Immunity of Smithsonian Institution from State Insurance Laws*, 21 Op. O.L.C. 81, 85 (1997) (citing *North Dakota*, 495 U.S. at 436–37 (plurality opinion)). For example, in *North Dakota*, the Supreme Court held that state liquor laws, as applied to suppliers of U.S. military facilities, did not violate the immunity doctrine, in part because they operated against suppliers rather than directly against the federal government and did not otherwise implicate "concerns about direct interference" with federal functions. 495 U.S. at 437 (plurality opinion) (citing *City of Detroit v. Murray Corp. of America*, 355 U.S. 489, 504–05 (1958) (opinion of Frankfurter, J.)).

By contrast, state laws purporting to regulate the functions of federal agencies themselves are direct regulations of the United States. *See id*. at 435 (plurality opinion). For example, in *Mayo v. United States*, 319 U.S. 441 (1943), the Supreme Court held that certain state inspection fees could not be applied to the federal government's distribution of fertilizer, observing that the fees were "laid directly upon the United States" and operated "like a tax upon the right to carry on the business of the post

office or upon the privilege of selling United States bonds through federal officials," *id.* at 447. The Court stated that the federal government's freedom from state regulation "is inherent in sovereignty." *Id.* Where "the governmental action is carried on by the United States itself and Congress does not affirmatively declare its instrumentalities or property subject to regulation or taxation, the inherent freedom continues." *Id.* at 448.

Similarly, in *Johnson v. Maryland*, 254 U.S. 51 (1920), the Court held that a state lacks the power to require a federal postal employee to obtain a license and pay a fee "before performing his official duty in obedience to superior command," *id.* at 55; *see also id.* at 57. The Court characterized the question as whether a state "can interrupt the acts of the general government itself." *Id.* at 55. The Court acknowledged that federal employees do not have "a general immunity from state law while acting in the course of [their] employment," and might be subject to state laws "affect[ing] incidentally the mode of carrying out the employment," such as "a statute or ordinance regulating the mode of turning at the corners of streets." *Id.* at 56. The Court observed, however, that "even the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Id.* at 56–57 (citing *In re Neagle*, 135 U.S. 1 (1890)). The Court held that the state law at issue in *Johnson* could not be applied to the postal employee, describing the statute as not "merely touch[ing]" federal employees "remotely by a general rule of conduct," but rather as "lay[ing] hold of them in their specific attempt to obey orders" and as "requir[ing] qualifications in addition to those that" the federal government had "pronounced sufficient." *Id.* at 57.

Consistent with these cases, in *Disaster Assistance*, our Office concluded that the Federal Emergency Management Agency ("FEMA") would not be subject to state prohibitions while administering disaster relief under the Disaster Relief Act of 1974, 42 U.S.C. §§ 5121–5202. *Disaster Assistance*, 5 Op. O.L.C. at 198. We observed that when Congress "place[s] responsibility for the execution of [federal] law in a federal official or instrumentality," that "execution of the law by the responsible official or agency is no less a federal activity than was the delivery of the mail in *Johnson* . . . , the operation of a bank in *McCulloch* . . . , or the sale of fertilizer in *Mayo*." *Id.* at 199–200. In other words, when a federal agency "perform[s] a federal function pursuant to a law validly enacted by Con-

gress[,] . . . under the Supremacy Clause, the states may not prohibit or, by regulation, significantly burden the manner of its execution without the consent of the United States." *Id.* at 200. We cautioned that this "does not mean that [agencies] may totally ignore state law in all cases and on all subjects." *Id.* We cited *Johnson*, where the Supreme Court remarked that a state law "'regulating the mode of turning at the corners of streets'" could still apply to federal employees undertaking their federal functions. *Id.* (quoting *Johnson*, 254 U.S. at 56). We also cited lower court decisions "refus[ing] to excuse, on Supremacy Clause grounds, federal employees who violated routine state (or local) traffic laws from prosecution when the violations were not necessary to the accomplishment of their federal functions." *Id.* (collecting cases). "In light of this case law, caution dictates that federal employees . . . should, to the extent possible, obey . . . state or local laws, the violation of which is not necessary to the accomplishment of the federal function." *Id.* Nonetheless, we concluded that "in exigent circumstances in which violations of such laws are necessary to permit FEMA to perform essential disaster relief activities under the [Disaster Relief Act], the federal interest would . . . prevail." *Id.* at 200–01.

As noted above, Congress (or an agency acting pursuant to statutory authorization) can authorize state regulation of federal functions that would otherwise violate the federal government's intergovernmental immunity, but such an authorization must be "'clear and unambiguous.'" *Washington*, 142 S. Ct. at 1984 (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988)); *see also Hancock v. Train*, 426 U.S. 167, 179 (1976) ("Because of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is a clear congressional mandate, specific congressional action that makes this authorization of state regulation clear and unambiguous." (footnotes and internal quotation marks omitted)).

## II.

Applying these general principles to potential state interference with VA's provision of abortion services as authorized by VA's rule, 87 Fed. Reg. 55,287, raises two questions: First, does federal law authorize VA and its employees to provide the specified abortion services? We conclude

that it does and that state attempts to interfere would thus constitute direct regulation of an authorized federal function. Second, does federal law clearly and unambiguously authorize states to restrict VA and its employees from providing the specified abortion services? We conclude that it does not.

### A.

VA's rule lawfully eliminated earlier regulatory exclusions that had prevented VA from providing abortion services and abortion counseling to veterans whom VA serves pursuant to VA's general treatment authority, 38 U.S.C. § 1710. VA's rule also lawfully eliminated regulatory exclusions that had prevented VA from providing certain abortion services and abortion counseling to beneficiaries of the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") whom VA serves pursuant to 38 U.S.C. § 1781.

### 1.

"The primary function" of the Veterans Health Administration within VA "is to provide a complete medical and hospital service for the medical care and treatment of veterans, as provided in" title 38 of the U.S. Code "and in regulations prescribed by the Secretary pursuant to" title 38. 38 U.S.C. § 7301(b); *see also id.* § 501(a) (authorizing the Secretary "to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws"). Pursuant to VA's general treatment authority, VA "shall furnish" specified veterans with "hospital care and medical services" that "the Secretary determines to be needed." *Id*. § 1710(a)(1)–(2). For veterans not described in paragraphs (1) and (2), the Secretary "may," subject to certain limitations, similarly "furnish hospital care" and "medical services . . . which the Secretary determines to be needed." *Id*. § 1710(a)(3). As relevant here, such "medical services" include "medical examination, treatment," "[s]urgical services," and "[p]reventive health services." *Id*. § 1701(6). "Except where the [statute] requires specific services or care for [a] designated medical condition, the Secretary has broad discretion to determine the precise hospital or medical services to be supplied." *E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.*, 257 F.3d 1352, 1362 (Fed. Cir. 2001).

VA implements its general treatment authority, and the Secretary determines what care is "needed," 38 U.S.C. § 1710(a)(1)–(3), by regulation establishing the scope of VA's "medical benefits package," 38 C.F.R. § 17.38. VA's medical benefits package consists of a wide range of basic and preventive care. *See id.* "Care included in the medical benefits package is 'provided to individuals only if it is determined by appropriate health care professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice.'" 87 Fed. Reg. at 55,288 (quoting 38 C.F.R. § 17.38(b)).

Before VA issued its recent rule, the medical benefits package had expressly excluded abortions and abortion counseling. *Id.* Such exclusions are not compelled by statute, and "VA did not explain the rationale behind" them when VA introduced them as part of the establishment of the medical benefits package in 1999. *Id.*; *see also* Enrollment—Provision of Hospital and Outpatient Care to Veterans, 64 Fed. Reg. 54,207, 54,217 (Oct. 6, 1999).

In its new rule, VA's Secretary has determined that access to abortion "is 'needed' within the meaning of VA's general treatment authority" when "the life or health of the pregnant veteran would be endangered if the pregnancy were carried to term" or when "the pregnancy is the result of an act of rape or incest." 87 Fed. Reg. at 55,288 (quoting 38 U.S.C. § 1710(a)). VA explained that pregnancy and childbirth can result in physical harm for certain pregnant individuals, and that individuals with pregnancy complications who lack access to abortion may risk loss of future fertility, significant morbidity, or death. *Id.* at 55,291. VA also explained the "severe health consequences associated with being forced to carry a pregnancy that is the result of rape or incest to term." *Id.* at 55,292. VA therefore concluded that access to abortion in such circumstances is "needed" medical care. 38 U.S.C. § 1710(a). Similarly, VA's Secretary determined that access to abortion counseling "is needed to ensure that [veterans] can make informed decisions about their health care." 87 Fed. Reg. at 55,288 ("Abortion counseling is a part of pregnancy options counseling and is a component of comprehensive, patient-centered, high quality reproductive health care both as a responsibility of the provider and a right of the pregnant veteran.").

Accordingly, VA eliminated the medical benefits package's exclusions for abortions and abortion counseling. *See id.* at 55,296; 38 C.F.R. § 17.38(c). This means that VA must now provide veterans access to abortions in the circumstances the rule specifies "if an appropriate health care professional determines that such care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice." 87 Fed. Reg. at 55,288 (citing 38 C.F.R. § 17.38(b)(1)–(3)). It also means that "abortion counseling will be provided as part of conversations a veteran has with their provider related to pregnancy options care, when appropriate." *Id.* at 55,292.

As VA explained in its rule, section 106 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943 ("VHCA"), does not prohibit VA from providing abortion care under its general treatment authority, 38 U.S.C. § 1710. *See* 87 Fed. Reg. at 55,288–89. As relevant here, section 106 of the VHCA states:

> In furnishing hospital care and medical services under chapter 17 of title 38, United States Code, the Secretary of Veterans Affairs may provide to women the following health care services: . . . [g]eneral reproductive health care, including the management of menopause, but not including under this section infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition.

106 Stat. at 4947. The text of section 106 specifies that its exclusions for "infertility services, abortions," and certain "pregnancy care" only limit VA's authority "under [that] section." *Id.* Those exclusions do "not limit VA's authority to provide care under any other provision of law." 87 Fed. Reg. at 55,289. Since 1993—shortly after the VHCA's enactment—VA has consistently interpreted section 106 in this fashion. *Id.* at 55,289 & n.5. VA's interpretation is therefore entitled to "considerable weight." *Davis v. United States*, 495 U.S. 472, 484 (1990) (courts "give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use" (citing *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 (1933))). Consistent with VA's longstanding interpretation, VA has "for decades . . . offered general pregnancy care and certain infertility services under" its general treatment authority, 38 U.S.C.

§ 1710, notwithstanding the exclusions that apply to services provided under section 106. 87 Fed. Reg. at 55,289. In its recent rule, VA also explained that Congress has legislated consistent with VA's interpretation, that section 106 has effectively been overtaken by subsequent legislation, and that VA no longer relies on section 106 to provide any services. *See id.* at 55,289–90. We agree that section 106 does not prohibit VA from providing abortion services to veterans pursuant to its general treatment authority, 38 U.S.C. § 1710.

## 2.

Pursuant to VA's statutory CHAMPVA authority, VA's "Secretary is authorized to provide" specified "medical care" to certain spouses, children, survivors, and caregivers of veterans who meet specific eligibility criteria. 38 U.S.C. § 1781(a). VA provides medical services to CHAMPVA beneficiaries that VA determines by regulation to be "medically necessary and appropriate for the treatment of a condition and that" VA has not "specifically excluded." 87 Fed. Reg. at 55,290 (citing 38 C.F.R. § 17.270(b)). VA also "must provide 'for medical care' under CHAMPVA 'in the same or similar manner and subject to the same or similar limitations as medical care is' provided by the Department of Defense to active-duty family members, retired service members and their families, and others under" a health benefits program known as TRICARE (Select). *Id.* (quoting 38 U.S.C. § 1781(b); citing 32 C.F.R. §§ 199.1(r), 199.17(a)(6)(ii)(D)).

Prior to VA's issuance of its rule, VA's CHAMPVA regulations excluded abortions except when a physician certified that the life of the woman would be endangered if the fetus were carried to term. 87 Fed. Reg. at 55,291. VA's CHAMPVA regulations also excluded abortion counseling. *Id.* at 55,292. Neither exclusion was compelled by statute. In its recent rule, VA's Secretary "determined that when the health of the pregnant CHAMPVA beneficiary would be endangered if the pregnancy were carried to term, access to abortions is . . . medically necessary and appropriate," *id.* at 55,291, for reasons similar to those summarized above, *see id.* at 55,291–92. VA's Secretary likewise "determined that access to abortion when the pregnancy is the result of an act of rape or incest is medically necessary and appropriate," *id.* at 55,292, again for reasons similar to those summarized above, *see id.* VA's Secretary also

determined that providing CHAMPVA beneficiaries with abortion counseling "is medically necessary to ensure that they can make informed decisions about their health." *Id.* at 55,293. Finally, VA explained how each category of newly authorized care is "the same or similar" as that provided by the Department of Defense under TRICARE (Select). 38 U.S.C. § 1781(b); *see* 87 Fed. Reg. at 55,290–93. VA therefore revised its CHAMPVA regulations to authorize such care. *See* 87 Fed. Reg. at 55,296; 38 C.F.R. § 17.272(a)(64).

### 3.

VA has "broad discretion," *E. Paralyzed Veterans Ass'n*, 257 F.3d at 1362, to determine what care is "needed" for veterans, 38 U.S.C. § 1710(a)(1)–(3), and has similarly broad discretion to determine what care is medically necessary and appropriate for CHAMPVA beneficiaries, *see* 38 U.S.C. § 1781(a); 38 C.F.R. § 17.270(b). VA has reasonably exercised its discretion in the rule, explaining why abortion counseling must be provided and access to abortion services must be provided when the life or health of the pregnant individual is endangered or in cases of rape or incest. Accordingly, federal law authorizes VA and its employees to provide the abortion and abortion counseling services specified in the rule. Moreover, states' attempts to restrict VA or its employees from providing such services would "'regulate the United States directly,'" and therefore would be invalid absent any federal law consenting to the application of state law. *Washington*, 142 S. Ct. at 1984 (alterations omitted) (quoting *North Dakota*, 495 U.S. at 435). In other words, because in providing these services VA is "performing a federal function pursuant to a law validly enacted by Congress," the Supremacy Clause precludes states from "prohibit[ing] or, by regulation, significantly burden[ing] the manner of" VA's "execution" of that function "without the consent of the United States." *Disaster Assistance*, 5 Op. O.L.C. at 200.

### B.

Consistent with VA's representation to us, we are not aware of any federal law that authorizes states to restrict VA and its employees from providing access to abortion services, let alone any law that does so "clear[ly] and unambiguous[ly]." *Washington*, 142 S. Ct. at 1984 (internal quotation marks omitted). To the contrary, VA's regulations provide

that state laws that "unduly interfere[]" with VA health care professionals' federal duties are preempted. 38 C.F.R. § 17.419(b)(1); *see id.* § 17.419(c). As a general matter, VA determines whether a state law "unduly interferes on a case-by-case basis." Authority of VA Professionals to Practice Health Care, 85 Fed. Reg. 71,838, 71,842 (Nov. 12, 2020). In its recent rule, VA determined that, consistent with 38 C.F.R. § 17.419, "State and local laws, rules, regulations, or requirements that restrict, limit, otherwise impede access to, or regulate the provision of health care provided by VA pursuant to Federal law, would unduly interfere with VA health care professionals' practice within the scope of VA employment." 87 Fed. Reg. at 55,294 (brackets and internal quotation marks omitted). "Accordingly, consistent with [38 C.F.R.] § 17.419," VA's rule "confirm[ed] that a State or local civil or criminal law that restricts, limits, or otherwise impedes a VA professional's provision of care permitted by" the rule—i.e., certain abortion and abortion counseling services—"would be preempted." *Id.* VA did bring to our attention its regulation governing "[s]ecurity and law enforcement at VA facilities," 38 C.F.R. § 1.218, which disclaims abrogation of "State or local laws and regulations applicable to the area in which the property is situated," *id.* § 1.218(c)(3). But that regulation is limited to matters involving security and law enforcement, not medical practice. It therefore does not subject VA and its employees to state restrictions on any forms of medical care.

\* \* \* \* \*

In conclusion, and as we previously advised, the rule is a lawful exercise of VA's authority. Moreover, states may not restrict VA and its employees acting within the scope of their federal authority from providing abortion services as authorized by federal law, including VA's rule. States may not penalize VA employees for providing such services, whether through criminal prosecution, civil litigation, or license revocation proceedings.

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*